CHARLES H. ELLINGWOOD

*vs.*

WOLF'S HEAD OIL REFINING COMPANY, INCORPORATED, a corporation of the State of Delaware, EUGENE W. CHASE, ARTHUR W. SCOTT, FREDERICK FAIR, EDWARD R. GNADE, BAYARD H. WATERBURY, EVERETT E. BELLEN, JOHN T. CARPENTER, J. ROLAND STEVENSON, PAUL M. GRIMM, and GEORGE M. MCINTOSH.

*New Castle, July 29, 1943*

*William S. Potter* of the firm of Southerland, Berl & Potter, and *John T. Carpenter*, of New York City, for petitioner.

*William Prickett* and *John G. Buchanan* and *Milton W. Lampropolos*, of the firm of Smith, Buchanan & Ingersoll, of Pittsburgh, Pa., and *Harold T. Parker*, of Oil City, Pa., for the corporation and for respondent Eugene W. Chase and others.

*David F. Anderson,* of the firm of Southerland, Berl & Potter, for respondent John T. Carpenter and others.

PEARSON, Vice-Chancellor: The question is whether the preferred or the common stockholders of respondent corporation were entitled to vote at the 1943 meeting. All parties are agreed that this is to be determined by a proper construction of the relevant provisions of the certificate of incorporation.

The corporation has two classes of capital stock: preferred and common. The dividend preference of the preferred stock bears an important relation to the voting power of the stockholders. Summarizing that preference, the holders of preferred stock are entitled to cumulative dividends of 6% of the par value (and no more) for each fiscal year of the company, before any dividends may be paid on the common stock. The voting power of each class of stock is defined in the following quotation from the charter:

"Except as otherwise required by the statutes of the State of Delaware, or as herein otherwise provided, the holders of the common stock shall exclusively possess voting power for the election of directors, and for all other purposes, and the holders of the preferred stock shall have no voting power; provided, however, that if at any time the corporation shall be in default in respect to the declaration and payment of dividends in the amount of two years' dividends on the preferred stock, then the holders of a majority of the preferred stock shall have an election to exercise the sole right to vote for the election of directors and for all other purposes, to the exclusion of any such right on the part of the holders of the common stock until the corporation shall have declared and paid for a period of a full year a 6% dividend on the preferred stock, when the right to vote for the election of directors, and for all other purposes, shall revert to the holders of the common stock. The election on the part of the holders of the preferred stock shall be consummated and effectuated by a notice to the corporation of their decision to exercise such right by holders of a majority of the preferred stock. During the time within which the holders of the preferred stock are exercising under this election the right to vote upon their stock, the holders of the common stock shall have no right to vote upon their stock. The said right of the preferred stock and its holders to exercise an election to vote shall survive any exercise of such elec-

tion and a subsequent reversion of the right to vote to the common stock and its holders, and shall be a continuing privilege and right of said preferred stock; and the subsequent right to a reversion of the voting power to the common stock in the event of the payment of a full year's 6% dividend shall be a continuing privilege and right of said common stock and its holders."

From 1929, when the corporation was organized, until 1936, the directors were elected by the common stockholders. In 1936, the corporation was in default in the declaration and payment of preferred dividends in the amount of more than two years' dividends. Commencing in that year and continuing through 1942, the preferred stockholders elected the directors. Various amounts of dividends were paid on the preferred stock. In June, 1941, and every three months thereafter, dividends of 1½% each were paid to the preferred stockholders, aggregating 10½%. Hence, in June, and again in September and December, 1942, the corporation was in the situation of having paid "for a period of a full year a 6% dividend on the preferred stock". However, the cumulative dividends in arrears at the end of 1942 were 37½%, or more than six years' dividends. No dividends have been paid during 1943.

In April, 1943, the holders of a majority of the preferred stock gave notice to the corporation of their election to exercise the sole right to vote, stating as the ground of their action that "the corporation is in default in respect to the declaration and payment of dividends in the amount of two years' dividends on the preferred stock."

At the annual meeting on May 3, 1943, certain preferred stockholders claimed the right to vote and attempted to elect a board of seven directors. Certain common stockholders, including petitioner, asserted that the exclusive right to vote had reverted to the common stockholders because the corporation had paid preferred dividends aggregating 6% during the fiscal year 1942 (under the by-laws, the fiscal year is the calendar year). They attempted to elect seven directors. Each slate included the petitioner, and respond-

ents Chase and Scott. The other four candidates of the preferred stockholders were respondents Fair, Gnade, Waterbury, and Bellen; and those of the common stockholders were respondents Carpenter, Stevenson, Grimm, and McIntosh. Petitioner brought this statutory proceeding to determine the validity of the election and the persons entitled to be directors of the corporation.

The controlling question, which class of stockholders had voting power at the meeting, is one of construction and is quite narrow. The general disposition of voting power provided by the charter, seems indisputably clear. It prescribes, in effect, that the common stockholders shall have exclusive voting power throughout the existence of the corporation, except during possible limited periods when that power may be exercised by the preferred stockholders. Such a period (which I shall call a preferred voting period) is initiated by the fulfillment of both of the following conditions: (1) the existence of a situation relating to arrearages in preferred dividends, as defined in the charter; and (2) the election by a majority of the preferred stockholders to exercise the voting power. Having been initiated, the period continues until terminated by the happening of a specified contingency; the payment of a 6% dividend on the preferred stock for a period of a full year. At such time, the right to vote reverts to the common stockholders.

Reviewing the facts, and applying the directions of the charter, the common stockholders exercised voting power from the organization of the corporation until 1936. In that year, a preferred voting period was initiated, and it continued until the terminating contingency happened; i. e., the corporation paid for a period of a full year a 6% dividend on the preferred stock. Thereupon, and this is conceded by all parties, the preferred voting period which had begun in 1936 came to an end, and the right to vote reverted to the common stockholders. The present problem is whether another preferred voting period has been rightly started. There can

be no doubt that the possibility of more than one preferred voting period during the existence of the corporation is contemplated under the charter, for it expressly provides that "The said right of the preferred stock and its holders to exercise an election to vote shall survive any exercise of such election and a subsequent reversion of the right to vote to the common stock and its holders, and shall be a continuing privilege and right of said preferred stock." In April, 1943, a majority of the preferred holders complied with the requirement of making an election to exercise voting power (referred to above as the second condition), and the sole question left is whether the facts existing at that time presented a situation within the meaning of the charter language relating to preferred dividend arrearages (the first condition).

The charter language just mentioned reads as follows: "if at any time the corporation shall be in default in respect to the declaration and payment of dividends in the amount of two years' dividends on the preferred stock * * *." When the preferred stockholders purported to elect to exercise voting power, and thus to inaugurate a second preferred voting period, the corporation was in default in respect to the declaration and payment of dividends in the amount of more than six years' dividends on the preferred stock. However, of these arrearages, substantially less than the amount of two years' dividends had accrued since the end of the first preferred voting period. Petitioner takes the position that because the amount of two years' unpaid dividends had not accrued after the voting power reverted to the common stockholders, the case was not within the situation defined in the charter, and hence, that the preferred holders were not entitled again to elect to exercise voting power. He argues that the language directing a reversion of the right to vote upon the payment of the 6% preferred dividend would not be given due effect unless the common stockholders be permitted actually to exercise that right, regardless of preferred dividend ar-

rearages existing when the reversion occurs; and that when a reversion occurs after the preferred holders have obtained the right to vote, the charter preserves the rights of the preferred holders to elect to vote, but does not save for them "the conditions upon the happening of which the power to exercise those rights arose."

I am unable to agree with petitioner's contention. Let us consider the dividend history of this company. From January, 1930, when dividends began to accrue, to May, 1936, when the preferred voting period began, dividends accrued on the preferred stock in the amount of $37\frac{1}{2}\%$ of the par value; but the dividends paid amounted to only 15%. So that when the first preferred voting period began in 1936, there were accrued and unpaid dividends in the amount of $22\frac{1}{2}\%$. From May, 1936, to the end of 1942, the corporation paid dividends in the aggregate amount of $25\frac{1}{2}\%$; but during this same time dividends accrued in the total amount of $40\frac{1}{2}\%$. It does not matter whether the dividends paid be treated as in satisfaction of the right to the dividends which accrued before, or those which accrued after May, 1936. In either event, more than the amount of two years' unpaid dividends accrued after May, 1936. In the charter language defining the dividend arrearage situation which is a condition of the right of the preferred holders to elect to vote, nothing is said or intimated about the time when the dividends must accrue, whether before, during, or after a preferred voting period. The normal and reasonable construction is, it seems to me, that all unpaid dividends, whenever they have accrued, are denoted. Nothing in the charter justifies the addition of a qualification that when voting power has reverted to the common stockholders from the preferred, the dividends must accrue subsequent to the reversion of voting power.

Moreover, petitioner's construction would lead to palpably inconsistent results. For example, although in some instances the existence of arrearages in the amount of two

years' dividends would entitle the preferred holders to elect to vote, nevertheless, in other instances, the existence of arrearages of substantially more than that amount would not authorize them to do so. The normal meaning of the language itself as well as the consequences of its application argue for the same construction: that the preferred holders are authorized to elect to exercise voting power at any time when preferred dividends are in default in the amount of two years' dividends, regardless of when they may have accrued.

It follows that the preferred stockholders were entitled to vote at the 1943 meeting, and that the candidates for whom they voted were validly elected directors.

A decree accordingly will be advised.

Note: Affirmed on appeal. See *post p. 356.*